Filed 1/22/21  P. v. Hood CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>EUGENE VERNON HOOD,<br><br>    Defendant and Appellant. | A158814<br><br>(City & County of San Francisco Super. Ct. No. SCN230531) |

A jury convicted defendant Eugene Hood of stalking, criminal threats, and contempt of court regarding a stay away or protective order.  The trial court sentenced him to the upper term of four years on the stalking count while staying the sentences on the remaining counts.  On appeal, defendant contends he was denied effective assistance of counsel because his attorney failed to object to the sentence on the stalking conviction, which defendant contends was based on an impermissible dual use of facts.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with stalking (Pen. Code, § 646.9, subd. (a)[1]; count one) from January 3, 2018, through December 10, 2018; stalking in violation of a restraining order (§ 646.9, subd. (b); count

---

[1]      Further statutory references are to the Penal Code.

1

two) from October 26, 2018, through December 10, 2018; criminal threats (§ 422; counts three, four, and six) committed on or about January 3, 2018, October 26, 2018, and November 6, 2018; violation of a domestic violence protective order, second conviction (§ 166, subd. (c)(4)), committed on or about October 26, 2018, and November 6, 2018; counts five and seven); and misdemeanor contempt of court regarding a stay away or protective order (§ 166, subd. (c)(1); counts eight, nine, and ten), committed on or about November 6, 2018, November 16, 2018, and December 10, 2018.

The evidence at trial established as follows. Defendant and P.W. met in 2011, began a romantic relationship, and eventually started living together in San Francisco. In May 2013, their daughter was born.

In August 2013, defendant and P.W. were at home arguing when defendant, while holding the baby, threatened to throw the baby against the wall and kill her.

In March 2014, defendant received a phone call that angered him, and he started breaking things around the house, including the baby's crib, stroller, and car seat. P.W. warned him that if anything else happened, she would call the police. Defendant told P.W. that if she broke up with him, he "would knock [her] head off and " 'make [her] life a living hell.' "

In April 2014, defendant pulled a scab off the baby's face, causing her to bleed. When P.W. told defendant he did not need to do that to the baby, defendant got angry, threatened P.W.'s life, threw the baby on the bed, and stomped around screaming. P.W. asked defendant to move out but he refused. P.W. said she was going to take the baby, but defendant prevented them from leaving, lunged at P.W. like he was going to hit her, and said he was going to punch her in the face. P.W. eventually left the house with the baby and went to the police station. After filing a police report, P.W. went to

2

a friend's home and was later notified that a restraining order had been served against defendant. Later that evening, P.W. received text messages from defendant saying, " 'You are a dead Butch [*sic*],' " " 'Bitch,' " " 'Dead,' " " 'I'm coming back and killing you,' " " 'You better not go home. I'm going to fuck up your car, bitch,' " and " 'I want my fucking clothes tomorrow. Call the cop, you silly bitch, ugly ass bitch. I hope you die.' "

Defendant was interviewed by police in April 2014. He admitted he had threatened to kill P.W. and the baby, but said he did not mean what he wrote. In June 2014, P.W. obtained a criminal protective order protecting her and the baby against defendant.

Sometime later in 2014, the couple resumed their relationship. Defendant took parenting classes, underwent therapy, and told P.W. he wanted to change and move on as a family. In 2016, however, P.W. ended the relationship. She moved to Oakland with the baby and told defendant not to come. For the next few years, P.W. tried to keep a cordial relationship with defendant and allowed weekly visits with their daughter.

P.W. eventually moved to San Francisco without telling defendant where she and their daughter were living. On January 3, 2018, P.W. received a phone call from defendant, saying, " 'I'm going to find where you live, and I'm going to kill you guys.' " P.W. called defendant's probation officer and filed a police report, and defendant was arrested. In March 2018, P.W. renewed the criminal protective order against defendant.

On the morning of October 26, 2018, P.W. received a text message from defendant that featured a screenshot of an entertainment event that P.W. was planning, along with the words, " 'I am going to do this. Deep, too, with hell of my dudes.' " P.W. interpreted this to mean that defendant was going to attend the event with many other people to start trouble. Later that

3

morning, defendant called P.W. and angrily threatened her. As recounted by P.W. at trial, defendant "said that he was going to find where I lived and kill me. He was going to slit my throat. He said he was going to get somebody to punch me in my face, knock my head off. He wished my legs would be broken. He said he was going to come to the party with a gun." That day, defendant called P.W. nine times in less than a half-hour period.

P.W. testified that between October 26, 2018, and November 6, 2018, defendant called her constantly, "more than 200 times" each day, and P.W. would turn off her phone or not pick up. Between October 27, 2018, and November 5, 2018, P.W.'s boyfriend, J.G., picked up the phone at least a dozen times when defendant called, and on those occasions, defendant threatened to kill J.G. and "shoot" P.W.

On November 6, 2018, and December 10, 2018, P.W. received calls from defendant. During the November 6 call, defendant told J.G. he was going to "shoot" P.W. at the event later that month. P.W. contacted the police, and defendant was arrested. During the December 10 call, defendant said "very threatening, very vile things" about J.G. and P.W.

Defendant testified on his own behalf at trial. He did not deny repeatedly threatening P.W., but he testified he said these things in the heat of the moment or while under the influence of alcohol and cocaine. He further admitted that he called P.W. many times between October 26, 2018, and November 6, 2018, but testified that he called because he wanted to apologize. He said he never intended to place P.W. in fear for herself or the baby.

The jury found defendant guilty of stalking in violation of a restraining order (count two), criminal threats (counts four and six), and contempt of

4

court (counts nine and ten).[2] The jury found defendant not guilty on both charges of violation of a domestic violence protective order, second conviction (counts five and seven) but found him guilty on both counts of the lesser included offense of misdemeanor contempt of court regarding a stay away or protective order.

The trial court sentenced defendant to four years in state prison—the upper term on count two. (§ 646.9, subd. (b).) In selecting the upper term, the court explained at length:

"In aggravation, there is the nature of the charge. This crime involved, [not] just a threat of a great bodily harm against [P.W.], but repeated threats, including threats of death against [P.W.].

"From my vantage point at trial, as well as seeing [P.W.] today, it's clear that she's visibly terrified of the defendant. During trial she was shaking uncontrollably at the start of her testimony, similar to what happened today at the sentencing hearing, so much that I had to take a break at the start of her direct examination at trial in order to enable her to compose herself.

"In light of the troubling nature of the threats that I heard, I have no doubt that [P.W.] took the death threats seriously, and that she was not simply exaggerating for the jury's benefit. That same state of emotion persists to this day.

---

[2] Count eight was dismissed prior to trial. The jury returned no verdict on count one, which the court instructed was a lesser crime of stalking as charged in count two, and the jury deadlocked on count three, resulting in a mistrial on that count.

"The most poignant and disturbing moment at the trial, in the Court's view, was when [P.W.] stated in absolute desperation about the defendant's conduct something to the effect of, 'He's never going to stop.'

"I note also that as far as stalking cases go, this was a case involving, not just a few harassing acts over a brief period of time, but literally hundreds of acts over a 12-month period. I recall seeing an exhibit that documented hundreds of repeated phone calls over the course of just several hours in one day. That also weighs heavily in favor of a more severe sentence than other cases involving similar charges for which a mid-term sentence might be appropriate."

Although the trial court found some factors in mitigation, such as defendant's satisfactory performance on probation and minimal criminal record, the court concluded that "[o]n balance, the aggravating factors far outweigh the factors in mitigation" and "weigh heavily in favor of an aggravated, instead of a mid-term or low-term sentence." Defense counsel did not object to the sentencing on count two.

The trial court also imposed but stayed sentences of three years for each of counts four and six, and one year for each of counts five, seven, nine, and ten.

Defendant appealed.

DISCUSSION

A criminal defendant has the right to the effective assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To succeed on a claim of ineffective assistance, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable

6

probability of a different outcome but for counsel's unprofessional errors. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 690, 694; *People v. Camden* (1976) 16 Cal.3d 808, 816.)  On direct appeal, relief may be obtained only if the record affirmatively discloses that counsel had no rational tactical purpose for the challenged act or omission, or that counsel was asked for a reason and failed to provide one and there simply could be no satisfactory explanation.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We conclude defense counsel's failure to object to the imposition of the upper term on count two did not constitute deficient performance under an objective standard, as there is a satisfactory explanation for this omission— namely, that counsel could reasonably have concluded such an objection would be futile.  (See *People v. Diaz* (1992) 3 Cal.4th 495, 562 [failure to object to admission of evidence is not ineffective where objection would have been futile].)  As we shall explain, the trial court's imposition of the upper term on count two was not based on a prohibited dual use of facts.

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . .  The court shall select the term which, in the court's discretion, best serves the interests of justice."  (§ 1170, subd. (b).)  "Circumstances in aggravation include factors relating to the crime."  (Cal. Rules of Court, rule 4.421(a).)  These include the fact that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness."  (*Id.*, rule 4.421(a)(1).)  The court may also consider "[a]ny other factors . . . that reasonably relate to the defendant or the circumstances under which the crime was committed."  (*Id.*, rule 4.421(c).)  A court may not, however, "use a fact constituting an element of the offense either to aggravate or to enhance a

7

sentence." (*People v. Scott* (1994) 9 Cal.4th 331, 350; Cal. Rules of Court, rule 4.420(d) ["A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term."].)

In imposing the upper term on count two, the trial court cited the hundreds of harassing contacts made by defendant over a twelve-month period, which included violent death threats against P.W., and which caused her significant fear that persisted at the time of trial and sentencing. Defendant contends these facts were elements of the crime of stalking, but he is mistaken. The crime of stalking requires the willful, malicious and repeated following or harassing of a person and the making of a credible threat with the intent to place that person in reasonable fear for his or her safety or the safety of his or her immediate family. (§ 646.9, subd. (a).) Harassment in this context means "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose," and " 'course of conduct' means two more acts occurring over a period of time, however short, evidencing a continuity of purpose." (§ 646.9, subds. (e), (f); *People v. Chilelli* (2014) 225 Cal.App.4th 581, 586.)

By its terms, the statutory language makes clear that a threat of *death* is not an essential element of the crime of stalking. Nor is it necessary that a defendant engage in *hundreds* of acts in order to satisfy the basic element of harassment. Where the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the sentencing court may use such evidence to aggravate the sentence. (See *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1775–1776 (*Garcia*).) Thus, in *Garcia*, the court rejected the argument that a finding of aggravation based on threats of great bodily injury during a robbery constituted a prohibited dual use of the "force

8

or fear" element of robbery. " '[T]he elements of force or fear do not need to be extreme for purposes of constituting robbery. [Citations.]' . . . [Citation.] A threat of *great* bodily harm, such as the trial court found here, exceeds this minimum requirement by definition." (*Id.* at p. 1776.) Likewise, defendant's hundreds of harassing contacts, which included several death threats, greatly exceeded the minimum requirements for stalking, and thus, the court's consideration of these factors to aggravate defendant's sentence did not constitute an impermissible dual use.

Defendant makes no effort to address or distinguish *Garcia*, and instead relies on *People v. Fernandez* (1990) 226 Cal.App.3d 669 (*Fernandez*) for the proposition that "a fact that is an element of a crime cannot be used to aggravate just because that fact is more extreme than usual." *Fernandez* provides no support for this contention. The defendant in *Fernandez* was convicted of numerous counts of lewd and lascivious conduct upon a child and one count of lewd conduct by force (§ 288, subds. (a) & (b)), and the evidence showed that the defendant had struck the victim's face, giving her a " 'fat lip.' " (*Fernandez*, at p. 675.) In imposing aggravated sentences, the trial court did not specify the bases for aggravation and merely incorporated the probation report. (*Id.* at pp. 677–678.) The appellate court concluded that while the defendant's act of giving the victim a " 'fat lip' " demonstrated sufficient force to establish the offense of lewd conduct by force (§ 288, subd. (b)), the trial court's failure to specify the bases for aggravation "made it impossible to determine whether it specifically determined that defendant used 'great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness' so as to make the aggravating factor applicable." (*Fernandez*, at p. 680.)

9

Significantly, *Fernandez* did not hold that the defendant's act of giving the victim a " 'fat lip' " could not supply a circumstance in aggravation due to the prohibition on dual use of facts. Rather, *Fernandez* determined that the trial court's failure to specify the bases for aggravation had defied "long-standing precedent" that "merely incorporating the probation report by reference . . . fails to properly explain the basis for any sentencing choice." (*Fernandez*, *supra*, 226 Cal.App.3d at pp. 678–679.) In contrast, the trial court here clearly identified defendant's threats of death and great bodily harm, among other things, as the bases for the aggravated sentence. As we have explained, consideration of these circumstances was permitted under California Rules of Court, rule 4.421(a)(1), and did not violate the prohibition against dual use of facts because such circumstances exceeded the minimum necessary to establish the crime of stalking. (*Garcia*, *supra*, 32 Cal.App.4th at p. 1776.)

Defendant's reliance on *People v. Reynolds* (1984) 154 Cal.App.3d 796 is likewise unavailing. There, the trial court had improperly used the victim's age and vulnerability to impose the upper term on charges of lewd and lascivious acts and child molestation by force, despite two appellate court decisions holding that the crimes themselves already provided increased punishment for these offenses based on the age and vulnerability of children. (*Id.* at pp. 807–808.) *People v. Reynolds* presents no parallel to this case.

The trial court also permissibly relied upon the fact of P.W.'s continuing fear of defendant, which evidently made a strong impression at trial. The severe effect of a defendant's conduct on a stalking victim is a fact reasonably related to the circumstances of the crime (Cal Rules of Court, rule 4.421(c)) and is not an element of the crime of stalking, which requires only that the defendant threatened the victim with the intent to place the victim

in reasonable fear for his or her and/or an immediate family member's safety. (§ 646.9, subd. (a).) The crime of stalking does not necessarily require proof of subjective fear, let alone of the magnitude that P.W. exhibited in this case.

Having rejected defendant's contention that the trial court impermissibly relied on the elements of the crime of stalking to aggravate his sentence on count two, we turn to his alternative argument that the trial court wrongly aggravated that sentence by impermissibly relying on the elements of his criminal threats convictions (counts four and six). It is true, as defendant points out, that the statutory elements of this latter crime include threatening the victim with "death or great bodily injury" and causing the victim to reasonably be in "sustained" fear for the safety of him- or herself and/or their immediate family. (§ 422, subd. (a).) But defendant cites no authority holding that the prohibition on dual use of facts applies across two separate counts, particularly where, as here, the sentences on counts four and six were stayed. California Rules of Court, rule 4.420(d) states, "A fact that is *an element of the crime on which punishment is being imposed* may not be used to impose a particular term." (Italics added.) On its face, the rule does not appear to prohibit the use of a fact underlying an element of another crime to impose an upper term on the crime for which punishment is being imposed.

In any event, even assuming defendant is correct, he fails to show that the trial court impermissibly used facts in this manner. Specifically, there was evidence of aggravating circumstances beyond the two instances of criminal threats charged in counts four (occurring on or about October 26, 2018) and six (occurring on or about November 6, 2018), and the trial court could permissibly rely upon such circumstances to aggravate the sentence on count two. In particular, between October 27, 2018, and November 5, 2018,

11

defendant threatened to "shoot" P.W. on at least a dozen calls. As these circumstances did not factually overlap with the two criminal threats convictions, there was no prohibited dual use of facts between the sentencing on count two and the convictions on counts four and six.

In sum, the trial court, in imposing the upper term on count two, did not improperly rely on the same elemental facts supporting defendant's convictions of stalking (count two) and criminal threats (counts four and six). Accordingly, there was no ineffectiveness of counsel in failing to lodge an objection on that basis.

**DISPOSITION**

The judgment is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Jackson, J.


A158814